**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Claude Nakhle | ) | **CASE NO.  1:19 CV 01470** |
| d/b/a Madison 89 Deli, | ) | |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| United States of America, et al., | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**INTRODUCTION**

Plaintiff Claude Nakhle, doing business as Madison 89 Deli, filed this Complaint for Judicial Review of Determination of U.S. Department of Agriculture, Food and Nutrition Service against defendant United States of America.[1]  The Complaint seeks reversal of the administrative decision permanently disqualifying plaintiff from participating in the Supplemental Nutrition Assistance Program ("SNAP").

This matter is before the Court upon defendant's Motion for Summary Judgment (Doc. 24).  For the reasons that follow, this motion is GRANTED.

---

[1]     The United States Department of Agriculture, Food and Nutrition Service was also named as a defendant, but the only proper defendant in an action for judicial review of a disqualification from the Supplemental Nutrition Assistance Program is the United States.  *See* 7 U.S.C. § 2023(a).

1

**BACKGROUND OF SNAP**

SNAP is a government program which is administered by the United States Department of Agriculture ("USDA") through the Food and Nutrition Service ("FNS").  7 U.S.C. § 2011-2036.  The purpose of SNAP is to allow "low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation."  7 C.F.R. § 271.1(a).  *See also* 7 U.S.C. § 2011.

A household's SNAP benefits are delivered through electronic benefit transfer ("EBT") cards, which operate similar to a debit card.  7 U.S.C. §§ 2013(a), 2016(j).  The EBT card can be used at authorized SNAP retailers to purchase eligible food items.  *Id.*  Upon purchasing an eligible food item with an EBT card, the amount of the purchase is automatically credited to the retailers's bank account.  *Id.*

A retailer must be authorized by the FNS to participate in SNAP.  Retailers are subject to disqualification or penalties for SNAP violations.  7 C.F.R. § 278.6.  For example, retailers may not accept EBT card payments for ineligible items or in exchange for cash.  These prohibited behaviors are defined as trafficking.  7 C.F.R. § 271.2.  The sanction for just one instance of trafficking is permanent disqualification from participation in SNAP.  *See* 7 U.S.C. § 2021(b)(3) (disqualification shall be permanent upon "the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or trafficking in coupons.").  However, the FNS may, in certain circumstances, impose "a civil money penalty in lieu of a permanent disqualification."  7 C.F.R. § 278.6(i).

The FNS takes considerable efforts to prevent trafficking by retail food stores.  These efforts include  electronically monitoring participating stores' EBT transactions and conducting

2

periodic store reviews.  7 C.F.R, § 278.6(a).  The FNS also uses the Anti-Fraud Locator Using EBT Retailer Transactions ("ALERT") system, a computerized fraud detection tool.  The ALERT system generates reports to identify EBT transactions that are statistically unusual and exhibit patterns that suggest a retailer is not complying with SNAP regulations.

A SNAP retailer may seek administrative and judicial review of an FNS trafficking decision. 7 U.S.C. § 2023(a).  After the FNS issues the retailer a written notice of its initial decision, the retailer may ask the FNS for additional administrative review. *Id.*; 7 C.F.R. § 279.  Following this review, the FNS renders a "final determination," at which point the retailer may seek judicial review. *See* 7 U.S.C. § 2023(a)(13); 7 C.F.R. § 279.

**FACTS**

Written documentary evidence submitted to the Court establishes the following.  Plaintiff Claude Nakhle is the owner of Madison 89 Deli ("the store"), located on Madison Avenue in Cleveland, Ohio.  In 1994, plaintiff obtained a SNAP license for the store.  According to plaintiff's deposition testimony, the store was previously disqualified from accepting SNAP benefits for a six-month period about ten years ago.

In February 2019, the FNS generated an ALERT report of the store's EBT transaction data from August 2018 through January 2019.  The ALERT report data exhibited patterns consistent with potential EBT trafficking violations.  Based upon this finding, the FNS began an investigation into the store.

On February 10, 2019, an FNS contractor conducted an on-site inspection of the store.  According to the inspection report, the store is 2,000 square feet and has one register and one EBT terminal.  It has no optical scanner to expedite checkout.  The store does not contain

3

shopping baskets, shopping carts, or a storage area.  The most expensive SNAP eligible items are Maxwell House Coffee at $10.99/can; Country Roast Coffee at $10.49/can; Banquet Fried Chicken at $9.29/box; and Banquet Chicken Breast Tenders at $6.89/box.  The store does not sell specialty or bulk food.  The store does sell deli meats by the pound, ranging in price from $2.69/pound to $4.39/pound.

According to plaintiff's deposition testimony, the store is 2,400 square feet and contains a storage room.  There are no shopping carts but shopping baskets are available.  The store has an optical scanner.  The store sells meat and cheese in bulk to a few customers on a regular basis. One specific customer places a large bulk meat order each month. Plaintiff does not have any receipts to document these transactions.  The bulk meat is priced at $5.99/pound for roast beef, $5.99/pound for turkey, $2.99/pound for chopped ham, and $8.99/pound for cooked ham.

Following the February 2019 inspection, the FNS conducted a detailed comparison of the store to nearby competitors and analyzed individual household shopping data.   Based upon this analysis, the FNS concluded that the transaction data established "clear and repetitive patterns of unusual, irregular, and inexplicable activity," which would warrant the issuance of a trafficking charge letter.

The FNS determined that the store's suspicious activity fell into two patterns: (1) multiple transactions in a set period of time by the same household account; and (2) SNAP transactions which were "large based on the observed store characteristics and recorded food stock."

a.  The First Pattern: Multiple Transactions

The first pattern contained 14 sets of transactions, totaling $1,864.18, where a single

household account would make multiple purchases at the store within a short time frame.  These transactions were as follows:

| Set | Date | Time | Amount |
|---|---|---|---|
| 1 | 10/15/18 | 1:00:19 PM | 39.23 |
|  | 10/15/18 | 1:01:00 PM | 39.19 |
| 2 | 12/06/18 | 10:24:36 AM | 42.09 |
|  | 12/06/18 | 10:25:54 AM | 40.09 |
| 3 | 09/14/18 | 10:51:18 AM | 50.45 |
|  | 09/14/18 | 10:53:57 AM | 25.20 |
| 4 | 01/16/19 | 9:12:04 AM | 46.40 |
|  | 01/16/19 | 9:40:25 AM | 43.98 |
| 5 | 09/20/18 | 12:59:01 PM | 37.89 |
|  | 09/20/18 | 1:49:20 PM | 43.49 |
| 6 | 11/20/18 | 10:54:05 AM | 45.90 |
|  | 11/20/18 | 12:22:44 PM | 59.10 |
| 7 | 08/20/18 | 11:35:01 AM | 49.19 |
|  | 08/20/18 | 4:04:34 PM | 29.15 |
| 8 | 1/11/19 | 3:43:45 PM | 25.15 |
|  | 1/11/19 | 3:47:27 PM | 35.09 |
|  | 1/12/19 | 9:01:51 AM | 36.19 |
| 9 | 11/12/18 | 1:12:53 PM | 62.36 |
|  | 11/13/18 | 12:02:47 PM | 31.52 |
|  | 11/13/18 | 12:12:54 PM | 57.71 |

| 10 | 12/13/18 | 2:35:55 PM | 38.58 |
| | 12/13/18 | 8:55:16 PM | 29.20 |
| | 12/14/18 | 1:41:30 PM | 62.69 |
| 11 | 1/28/19 | 8:31:02 AM | 46.53 |
| | 1/28/19 | 1:45:24 PM | 23.99 |
| | 1/28/19 | 3:14:44 PM | 22.99 |
| | 1/29/19 | 8:23:34 PM | 43.09 |
| 12 | 10/12/18 | 1:05:07 PM | 45.98 |
| | 10/12/18 | 1:07:16 PM | 40.39 |
| | 10/13/18 | 11:52:07 AM | 61.49 |
| | 10/13/18 | 12:02:49 PM | 31.89 |
| | 10/13/18 | 1:02:40 PM | 47.89 |
| 13 | 1/25/19 | 8:28:46 AM | 42.59 |
| | 1/25/19 | 10:01:45 AM | 38.75 |
| | 1/26/19 | 9:48:19 AM | 47.09 |
| | 1/26/19 | 2:17:45 PM | 43.85 |
| 14 | 8/06/18 | 12:09:41 PM | 95.12 |
| | 8/06/18 | 12:11:12 PM | 90.02 |
| | 8/07/18 | 10:49:16 AM | 29.08 |
| | 8/08/18 | 11:44:10 AM | 143.60 |

The FNS found these transactions to be indicative of trafficking for several reasons.

First, the FNS noted several of these transactions occurred minutes apart.   The FNS noted that

the first two transactions in set 12 and set 14 occurred two minutes apart.  The FNS also

observed that the transactions contained in set 1 and 2 were 78 seconds apart or less.  The FNS

found these short time frames significant because in order for these transactions to be possible, a

SNAP recipient would have to "quickly gather eligible items and carry these back to the sole

checkout area without the assistance of a shopping cart or hand basket and the cashier would

have to input individual item amounts into the cash register, provide a total amount to the

customer, who in turn [would] complete payment with an EBT transaction" all within a very

short amount of time.

Second, the FNS also noted that transactions contained in sets 1 and 2  were of "nearly

identical amounts" and found it "unlikely the household would forget equal amounts of food

items and require SNAP transactions of nearly identical amounts."

Finally, the FNS found these transactions suspicious because customers in the flagged

transactions also frequently spent their SNAP benefits at "better-stocked and more competitively

priced grocery stores, sometimes on or about the same day they shopped at" the store.  The FNS

identified much larger stores with more reasonable prices located within one mile of the store.

The FNS concluded there was "no compelling reason for a household to forgo the benefits of the

larger stores" in favor of the store.

The FNS examined the shopping patterns of three households during the review period in

reaching this conclusion.  The FNS observed that household number one, whose transactions are

contained in set 14, spent $259.11 at two supermarkets on August 5, 2018.  The following day,

on August 6, 2018, this same household made two transactions at the store within two minutes

for $95.12 and $90.02.  This household then returned to the store less than 24 hours later, on

August 7, 2018, to make a $29.08 purchase.   During the next hour the household proceeded to spend $108.81 at a medium ethnic grocery store and $49.26 at a supermarket.  On August 8, 2018, this household returned to the store to make a $143.60 purchase.  The FNS observed that during other points of the review period, this household would exhibit this same pattern of conducting very large transactions at the store, followed by purchases at much larger stores. The FNS observed that "there is no compelling reason for the household to make large dollar transactions at the subject store the same day or within a day [of] making a transaction at a supermarket with more available food selection at lower prices."

Household number two, whose transactions are contained in sets 9, 10, and 12, also exhibited this pattern of making multiple large dollar SNAP transactions at the store before making SNAP transactions at supermarkets.  The FNS again noted that the supermarkets frequented by household number two had better food selections at similar or lower prices than the store.

Household number three, whose transactions are contained in set 11, shopped at the store three times on January 28, 2019, before going to a grocery store that very same day.  The grocery store had better food stock and lower prices than the store.

b.       *The Second Pattern: Large Transactions*

The second set of transactions that formed the basis of the FNS's trafficking decision were 207 high dollar EBT transactions, ranging from $25.93 to $254.55.  According to the FNS, these transactions exceeded the average transaction amount for a convenience store in the state of Ohio by at least 300%.  The FNS characterized these transactions as large "based upon the observed store characteristics and recorded food stock."   The FNS also observed that one

8

particular household made a large purchase at the store the same time each month during the review period.

On February 27, 2019, the FNS issued plaintiff a charge letter based upon the analysis of these two patterns of transactions.  The letter informed plaintiff that the store was being charged with SNAP trafficking.  The letter explained that this charge was based upon a review of the EBT transaction data that established "clear and repetitive patterns of unusual, irregular, and inexplicable activity."  The letter contained two attachments which identified the 247 suspicious transactions (40 in pattern one and 207 in pattern two) that formed the basis of the trafficking charge.

The letter advised plaintiff that if it was determined the store "committed the trafficking violations noted above, it will be permanently disqualified" from SNAP.  The letter provided plaintiff with an opportunity to "present any information, explanation, or evidence" to challenge the charge.  The letter also informed plaintiff that he could request consideration of a civil money penalty ("CMP") in lieu of permanent disqualification if he submitted supporting documentation within ten calendar days.  The letter warned  plaintiff that he would lose his right to any further consideration of a CMP if the request and required documentation were not timely received.

On March 6, 2019, plaintiff responded to the charge letter and denied the trafficking violations.  Plaintiff's response stated that it was "not unusual for the customer of the store to make several separate purchases on the same day."  Plaintiff did not submit any receipts for the purchases in question.  Plaintiff did submit 2016 and 2017 S-Corp Income Tax Returns, but they did not specify what portion of the store's sales were SNAP transactions  Plaintiff's response

also indicated that he would "consider an equitable CMP."  He did not include any additional documentation in support of this CMP request.

On March 12, 2019, the FNS issued a determination letter finding that plaintiff had engaged in SNAP trafficking and permanently disqualified the store from SNAP.  The letter also concluded that plaintiff was not eligible for a CMP because he failed to submit sufficient evidence to demonstrate that the store had "established and implemented an effective compliance policy and program to prevent" SNAP violations.

On March 20, 2019, plaintiff sought administrative review of the trafficking determination.  He also contested the determination that he was not eligible for a CMP by noting that there "obviously is an effective compliance program in place, considering there has never been an alleged rule violation in twenty-five years of participation."  Plaintiff did not submit any evidence of this compliance program.

On May 27, 2019, an Administrative Review Officer ("ARO") with the USDA issued a Final Agency Decision affirming the trafficking determination and permanent disqualification penalty.  The ARO determined that plaintiff "provided inadequate explanations for the suspicious transactions and insufficient evidence to legitimize its transaction data."  With respect to the first pattern of transactions, the ARO provided the following discussion:

> Appellant contends it is not unusual for customers to make several purchases on the same day.  While there are legitimate reasons why a SNAP recipient might return to a convenience store in a short period of time, the examples in Attachment 1 indicate a series of purchases that total to large amounts.  SNAP benefits are intended to supplement the food budget for households whose net income is near or below the Federal Poverty Level.  It is difficult to believe customers who must rely on SNAP benefits to make ends meet prefer to pay higher prices and spend considerable amounts of their benefits at a convenience store.  Spending sizable portions of one's SNAP benefit allotment in a convenience store - where there are larger stores at which one also shops

10

that carry more variety of foods at a lower cost – is unreasonable customer behavior.  Moreover, households listed in this attachment conducted this strange shopping pattern of making substantial purchases at Appellant multiple times during the review period.  Given the common practice of violating retailers breaking up large, suspicious transactions into multiple, smaller transactions to avoid detection, a firm's explanation and evidence for why these transactions are occurring in a 24-hour period in a convenience store should be both rational and compelling, Appellant's explanation is neither.

With respect to the second pattern of transactions, the ARO found:

Based on the store layout, infrastructure, and available inventory, it is not credible that the Appellant would frequently conduct large transactions closely resembling those typically found at a supermarket or superstore.  It is not plausible that the firm's customers would regularly carry very large amounts of merchandise around the store without the benefit of shopping carts and shopping baskets, especially since larger, better-stocked stores are readily available and in the vicinity of the Appellant firm.  Appellant is not set up to process high dollar transactions, as indicated by its lack of equipment to facilitate large transactions and limited counter space.  There are no legitimate bases for SNAP customers' unusual attraction to the firm such as a superior selection of staple foods, price advantages, package specials, bulk or promotional items, an extensive variety of otherwise unavailable ethnic food items, or special services rendered.  Appellant failed to provide convincing evidence to establish the legitimacy of these excessively large transactions, such as itemized cash register receipts.  Based on all of these factors discussed in this section, the large volume of transactions for high-dollar amounts is unlikely to indicate a pattern of legitimate food purchases.

The ARO also concluded that plaintiff was ineligible for a CMP because plaintiff did not submit any documentation to support CMP eligibility by the deadline.

On June 25, 2019, plaintiff filed a Complaint in this Court seeking judicial review of the Final Agency Decision pursuant to 7 U.S.C. § 2023(a).  This matter is now before the Court upon defendants' Motion for Summary Judgment.  Plaintiff opposes the Motion.

## STANDARD OF REVIEW

**A.**     **Summary Judgment**

11

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos., Inc*., 8 F.3d 335, 340 (6th Cir.1993).  The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial

12

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).

**B.**     **Review Under 7 U.S.C. § 2023**

Under 7 U.S.C. § 2023(a)(13), a SNAP authorized retailer may obtain judicial review of a disqualification.  Such suit "shall be a trial *de novo* by the court in which the court shall determine the validity of the questioned administrative action in issue."  7 U.S.C. § 2023(a)(15).[2] In reviewing the administrative action, a "court is to make its own findings based upon the preponderance of evidence and not limit itself to matters concerned in the administrative proceeding."  *Warren v. United States*, 932 F.2d 582, 586 (6th Cir. 1991).  Nevertheless, it is the plaintiff's burden to "establish the invalidity of the administrative action by a preponderance of the evidence."  *Id*. at 586.

However, because the SNAP regulations allow for disqualification upon just one instance of trafficking, in order to survive summary judgment, a retailer "must raise material issues of fact as to *each* alleged violation."  *McClain's Market v. United States*, 214 Fed.Appx. 502, 505 (6th Cir. 2006)(emphasis in original).  *See also Ganesh v. United States*, 658 Fed.Appx 217, 219 (6th Cir. 2016).

**ANALYSIS**

**I.**     **Trafficking Determination**

---

[2]      This *de novo* review is "limited to determining the validity of the administrative action."  *Goldstein v. United States*, 9 F.3d 521, 523 (6th Cir. 1993).  A review of any sanction imposed is subject to a much narrower standard of review.  Indeed, once the reviewing court has determined "that the store has violated the statutes and regulations, the court's only task is to examine the sanction imposed in light of the administrative record in order to judge whether the agency properly applied the regulations, i.e., whether the sanction is 'unwarranted in law' or 'without justification in fact.'"  *Id*. at 523.

The Complaint seeks reversal of the FNS's determination that the store engaged in SNAP trafficking.  Defendant maintains that the FNS's trafficking determination is fully supported by the administrative record.  Defendant argues that plaintiff has not provided "evidence to show that any of the flagged transactions were legitimate SNAP transactions."  According to plaintiff, summary judgment is inappropriate because there are genuine issues of material fact as to whether a trafficking violation occurred.

As noted above, the FNS identified 247 transactions which formed the basis of the trafficking charge.  These transactions were grouped into two patterns indicative of trafficking: (1) back-to-back transactions by the same EBT account and (2) transactions that were large based upon the observed store characteristics and food stock.  For the following reasons, the Court finds that plaintiff has raised material issues of fact as to some, but not all, of these transactions.

With respect to the first pattern, the FNS found these transactions to be suspicious for several reasons.  First, many of these transactions were processed rapidly, often within a 2-minute time frame.  The FNS reasoned that the size of the store's checkout area would make it difficult to process these transactions in such a short period of time.  The FNS partially based its reasoning on the results of the February 2019 on-site investigation indicating the store had no shopping baskets or optical scanner.  However, plaintiff's deposition testimony indicates that the store had both hand baskets and an optical scanner to expedite checkout.  Construing the evidence in the light most favorable to plaintiff, the store could conceivably process transactions in a short time frame.

Nonetheless, the Court finds these disputed facts are insufficient for plaintiff to meet the

14

Case: 1:19-cv-01470-PAG  Doc #: 28  Filed: 11/20/20  15 of 21.  PageID #: 419

high burden of creating an issue of material fact as to each transaction contained in the first pattern. *See McClain's Market*, 214 Fed.Appx. at 505. Indeed, the FNS determined that several of these transactions were indicative of trafficking for reasons unrelated to the availability of an optical scanner or hand baskets. An analysis of individual household shopping data revealed that several of the households would routinely make a larger purchase at the store prior to shopping at a better stocked and lower priced grocery store on the same day. In each case, the households had the ability to travel throughout the day to access stores with better food selection and prices yet chose to spend large portions of their SNAP benefits at the store, often multiple times a day.[3]

Plaintiff raises no issue of material fact with respect to these transactions. He also does not contest the accuracy of the EBT data underlying the finding of trafficking.[4] Rather, plaintiff argues that this Court should not rely on the EBT transaction data because there is "no direct evidence or any witness who actually saw trafficking." Plaintiff asserts that the FNS's conclusions are "all circumstantial" and based upon "randomly citing to a specific or a group of transactions." However, there is no requirement that a food retailer be caught "red-handed"

---

[3]  Courts have granted summary judgment to the government where disqualification decisions were based in part on individual household shopping data that exhibited patterns similar to the circumstances presented here. *See Shreegi Enterprises v. United States,* 2018 WL 1919576, *24-26 (M.D. PA 2018); *Sky Grocery, LLC v. USDA,* 2017 WL 1054484, *3 (D Conn. 2017); *J & L Liquor, Inc. v. United States,* 2017 WL 4310109, *3 (E.D. Mich. 2017); *PT Nguyen, Inc. v. United States,* 2019 WL 4601845, *9 (M.D. La 2019); *Yennes Food Mart v. United States*, 2018 WL 1354446, *4-5 (W.D. Ky 2018).

[4]  Plaintiff suggests that perhaps it was a non-employee who engaged in SNAP trafficking at the store. The only evidence presented to support such an explanation is plaintiff's testimony that a non-employee was filling in for an employee during the February 2019 inspection. However, none of the transactions flagged by the FNS occurred in February 2019.

15

misusing SNAP benefits.  *Hanna v. United States*, 2007 WL 1016988, *7 (E.D. Mich. 2007).

Indeed, Congress has expressly authorized disqualification decisions premised on EBT data from

the ALERT system.  7 U.S.C. § 2021(a)(2); 7 C.F.R. § 278.6(a).  Courts within this Circuit have

also routinely relied on EBT transaction data to affirm trafficking determinations.  *See Ganesh*,

658 F. App'x at 217; *McClains Market*, 214 F. App'x at 502; *J&L Liquor, Inc. v. United States*,

2017 WL 4310109 (E.D. Mich. 2017).

> Plaintiff also asserts that the pattern of one household conducting multiple transactions at

the store within a short time frame was "usual in [the] area."  Plaintiff explained that a customer

would often come into the store and make a large purchase, and then their family members

would come into the store several minutes later and make additional purchases.  Plaintiff has not

provided any receipts or other evidence to support this explanation.  "General statements about

customers' shopping patterns or other customer practices are not enough to create a triable issue

of fact*."  J & L Liquor, Inc. v. United States,* 2017 WL 4310109, *6 (E.D. Mich. 2017).  *See also*

*McClain's Mkt v. United States.*, 411 F. Supp. 2d 772, 777 (N.D. Ohio 2005) (a store owner's

affidavit, which was unsupported by any other evidence, presented no direct explanation for any

of the transactions flagged by the FNS, but merely asserted general justifications for the

transactions and was therefore insufficient to survive summary judgment), *aff'd*, 214 Fed.Appx.

502 (6th Cir. 2006); *K & O Food Mart v. USDA*, 2019 WL 2870313, *6-7 (D. Mass. 2019)

(plaintiff's explanations regarding customers making several trips to the store in one day not

enough to create an issue of material fact because it was "conjecture" and not supported by

evidence); *Payano v. United States*, 2019 WL 3069695, *11 (M.D. Penn. 2019) (explanations

regarding customers' general shopping practices not enough to create an issue of material fact),

*report and recommendation adopted*, 2019 WL 3067254 (M.D. Penn. 2019); *Shreggi Enterprises, Inc. v. United States,* 2018 WL 1919576, *21 (M.D. Penn. 2018) ("The evidence to support the validity of these transactions in the second pattern only goes to its' customers' general shopping practices, which is not enough.")

Plaintiff also argues that these transactions "do not support an inference of trafficking" because the total amount for these suspect transactions was "a mere $1,864.18."  However, the definition of trafficking does not include a minimum amount.  *See* 7 C.F.R. § 271.2.  Indeed, there is no amount of trafficking that is "too small" to be considered a violation and just one trafficking violation is sufficient to permanently disqualify a firm from further participation in the SNAP program.  *See* 7 U.S.C. § 2021(b)(3).  *See also Banga v. United States*, 2018 WL 2337586, *6 (W.D. Tenn. 2018) (rejecting argument that violations were "de minimis" because the amount trafficked was $40, noting the regulations "do not make an exception for transactions involving minimal exchanges of cash.")  Moreover, "[m]ultiple, rapid transactions from the same SNAP-eligible household is a well-recognized indicator of SNAP benefit trafficking."  *K & O Food Mart* , 2019 WL 2870313 at *5.  *See also Ganesh*, 658 Fed.Appx at 221, n1 (affirming trafficking violation where "the FNS documented 118 sets of [transactions] by 29 households, including times in which the same household had two transactions of over fifty dollars each within two to three minutes of each other.")

With respect to the second pattern, the FNS found these transactions suspicious because these transactions exceeded the average transaction amount for a convenience store in the state of Ohio by at least 300%.  The FNS characterized these transactions as large "based upon the observed store characteristics and recorded food stock.," including the lack of hand baskets and

bulk food sales.  However, plaintiff's deposition testimony indicates that the store has hand baskets and sells meat and cheese in bulk.  Plaintiff argues that "it is reasonable to presume that [the store's] average transactions would be higher" than other convenience stores because of these meat sales.

Viewing the evidence in the light most favorable to plaintiff, the Court agrees that this testimony could create an issue of material fact with respect to all of the high dollar transactions flagged by the FNS.  Indeed, accepting plaintiff's testimony as true, if the store sells deli meat and cheese in bulk then the FNS relied on an inaccurate assessment of the store's food stock in determining that these transactions were suspicious.  Moreover, plaintiff's testimony that one specific customer regularly places a bulk meat order could explain why one household regularly made a high dollar transaction at the store each month.  However, while plaintiff may have raised a material issue of fact as to the second pattern transactions, he has not created an issue of material fact as to all of the transactions contained within the first pattern.[5]

In sum, plaintiff had a demanding standard to satisfy: he was required to raise a material issue of fact as to *each* of the alleged violations.[6] *McClain's Market*, 214 Fed.Appx at 505.  *See*

---

[5]  Plaintiff also argues that the FNS failed to properly consider the three factors listed under 7 C.F.R. § 278.6(d) when "reviewing evidence to form the basis of its alleged violation."  Plaintiff asserts that had these three factors been considered "a determination of trafficking would not be supported."  However, the factors listed under § 278.6(d) goes to the determination of the severity of the sanction to be imposed, not whether or not trafficking occurred.  *See Goldstein*, 9 F.3d at 523-524.

[6]  Plaintiff cites to *Betesfa, Inc., v. United States*, 410 F.Supp.3d 132 (D.D.C. 2019) in support of his argument that summary judgment is not appropriate.  However, in *Betesfa,* the government filed a motion for summary judgment prior to engaging in discovery with the plaintiff.  The plaintiff proceeded to provide multiple explanations, supported by declarations from customers, for the suspicious transactions flagged by the FNS.  *Id.* at 139.  The plaintiff also

*also Ganesh*, 658 Fed. Appx at 221 (finding that while plaintiff was able to explain some of the suspicious transactions, it was not able to "raise material issues of fact as to *each* alleged violation, and having failed to do so, summary judgment was warranted.") (emphasis in original) While plaintiff may have presented some disputes of fact that negate some of the inferences from the EBT data, he has not raised material issues of fact as to all the transactions that formed the basis of the trafficking violation.[7]  Accordingly, the Court grants summary judgment to the defendant with respect to the trafficking determination.

**II.      Civil Monetary Penalty**

The Complaint alternatively seeks a civil monetary penalty ("CMP") in lieu of permanent disqualification.  Plaintiff argues that the FNS's chosen penalty of permanent disqualification was improper because the store has a training program for its employees and has generally complied with the SNAP regulations.  Defendant argues that because plaintiff presented no evidence that the store met the regulatory requirements for a CMP, the decision not to impose one complied with the regulations.

Pursuant to 7 C.F.R. § 278.6(e)(1)(i), the FNS must permanently disqualify a retailer from SNAP for trafficking violations.  However, in certain circumstances the FNS has the

---

provided receipts and inventory invoices to dispute the trafficking charge.  *Id.* at 140.  The court denied the government's motion for summary judgment, reasoning that because the plaintiff provided evidence and explanations for the flagged transactions, the plaintiff should be provided with an opportunity to engage in discovery to dispute the trafficking charge.  *Id.* at 141.  Here, by contrast, discovery has concluded and plaintiff has been unable to identify an issue of material fact with respect to many of the violations.

[7]      Defendant also notes two sets of manual entry EBT transactions which the FNS found to be suspicious.  These transactions were not included in the 247 flagged transactions that formed the basis of the trafficking charge.  Regardless, plaintiff does not provide any specific argument or explanation for these transactions.

discretion to impose a CMP  in lieu of disqualification.  7 C.F.R. § 278.6(i).  In order to be considered for a CMP, a retailer must submit substantial evidence of: (1) an effective compliance policy; (2)  an effective personnel training program; (3) the existence of a compliance policy and program prior to the violations in question; and (4) ownership not being aware of and not being involved with the trafficking violations or that it was only the first occasion that management was aware of or involved in the conduct of the trafficking violations.  7 U.S.C. § 278.6(i).  The regulations further specify that a food retailer seeking a CMP must provide documentation of its compliance policy and training program, including materials such as dated training curricula and the dates that training sessions were conducted.  7 C.F.R.§ 278.6(i)(2).

Viewing the evidence in the light most favorable to plaintiff, the Court finds no evidence that the plaintiff submitted the documentation outlined in the regulations above to the FNS. Indeed, it is undisputed that plaintiff failed to submit any documentation to the FNS showing that the store had an effective compliance policy, that said policy was in operation before the violations occurred, or that it had a training program for its employees.  Plaintiff indicated to the FNS that a compliance policy and training program existed; however, the only evidence plaintiff offered was his own assertion that there were no prior violations.[8]  This falls short of what is required under the regulations.  *See Traficanti* v. *United States*, 227 F.3d 170, 174-176 (4th Cir.

---

[8]     Plaintiff also asserted that he was uninvolved in any of the violations.  However, in order to be considered for a CMP, a food retailer must submit substantial evidence to satisfy all four criterion.  *See* 7 U.S.C. § 278.6(i).  Furthermore, the FNS is authorized to impose permanent disqualification even when a store owner was unaware of the trafficking when it occurred.  *See Bakal Bros., Inc. v. United States*, 105 F.3d 1085, 1088-1090 (6th Cir. 1997) ("a store is responsible for illegal trafficking by employees even if there is evidence that neither the owner nor manager of the store 'was aware of, approved, benefitted from, or was involved in the conduct or approval of the violation.'")

20

2000) ("Store owners cannot simply attest to having effective antifraud programs; rather, they must prove it."); *Quraan v. United States*, 2012 WL 2568076, at *4 (N.D. Ohio 2012) (granting summary judgment to government where there was no evidence that the store owner provided the FNS with documentation that the CMP criteria were met).  While plaintiff maintains that he "complied with § 278.6(i)(1)," he fails to present any evidence that the required documentation for CMP qualification was submitted to the FNS.

For these reasons, plaintiff fails to establish a genuine issue of material fact with respect to the penalty chosen by the FNS.  Accordingly, the Court grants summary judgment to defendant.

## **CONCLUSION**

For the foregoing reasons, defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge
Chief Judge

Dated: 11/20/20

21